IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 05-cv-02171-WDM-MJW

METRO WASTEWATER RECLAMATION DISTRICT, a political subdivision of the State of Colorado,

    Plaintiff,

v.

ALFA LAVAL, INC., a New Jersey Corporation, and
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a corporation of the State of Pennsylvania,

    Defendants.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Miller, J.

This matter is before me on the Consolidated Motion for Summary Judgment (doc no 125) filed by Defendants Alfa Laval, Inc. ("Alfa Laval") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), which seeks judgment on two counterclaims and one affirmative defense. Plaintiff opposes the motion. After a review of the complaint and the parties' written arguments, I conclude oral argument is not required. For the reasons that follow, the motion will be granted in part and denied in part.

Background[1]

---

[1] The facts set forth here are taken from the parties' briefs and attached exhibits and are undisputed unless otherwise noted. Plaintiff purports to dispute a number of Defendants' statements of undisputed fact, but most of its challenges are based on minor word choice quibbles or arguments about the materiality of the alleged fact. To the extent that Defendants' statements of fact are supported by appropriate evidence pursuant to Rule 56 and Plaintiff does not offer contradictory evidence, I will consider the facts to be undisputed.

Plaintiff is responsible for treating wastewater for the Denver area. After treatment, clean water is discharged into the South Platte River and sludge (biosolids) is sold as a commercial fertilizer. Plaintiff uses centrifuges to remove moisture from the sludge to make a cake product which is shipped to agricultural areas for use as fertilizer. Between 1998 and 2000, Plaintiff determined that its existing dewatering centrifuges would soon need replacement. Accordingly, it determined to purchase four new centrifuges to be installed in the Denver area wastewater treatment facility (the "Plant").

Plaintiff retained the engineering firm of Black & Veatch ("B & V") to prepare designs and contract specifications to be incorporated into bid documents for procuring the centrifuges. On October 9, 2000, Plaintiff issued a Request for Qualifications ("RFQ") inviting centrifuge manufacturers to submit a statement of qualifications regarding their ability to provide the desired centrifuges. The RFQ included minimum dewatering criteria for a manufacturer to be considered qualified to bid. Specifically, the machines had to be capable of producing 24% dewatered cake dry solids concentration using no more than 28 pounds of polymer (as a conditioner) per dry ton solids. Defendants' Exh. A-3 (doc no 126-4) at 00015-3. Plaintiff intended only to accept bids from manufacturers that could offer centrifuges meeting these criteria.

After reviewing the responses to the RFQ, Plaintiff determined that only Alfa Laval and Andritz-Ruthner, Inc. ("Andritz") had products likely to meet Plaintiff's needs. Accordingly, both manufacturers were invited to perform on-site pilot testing of their centrifuge units during the fall and winter of 2000. The manufacturers would then prepare a bid based on the pilot testing results on the conditions presented at the site. Alfa Laval conducted its pilot tests in November 2000. Andritz conducted its pilot tests in December

2

2000.

According to a B & V conference memorandum dated December 15, 2000, "Preliminary results from [Alfa Laval's unit] indicate that cake dryness of 25 percent total solids can be achieved with 33 lbs/dry ton polymer dose at a feed sludge temperature of 98 F." Defendants' Exh. A-4, Affidavit of Mark Fetter (doc no 126-5) at Exhibit 4. The same memorandum noted that Andritz had not yet been able to match the cake dry solids performance of the Alfa Laval unit but that pilot testing was continuing. *Id.* In a similar vein, according to handwritten notes from a representative of Andritz, apparently recording a conversation with a representative of B & V on December 7, 2000, "[Alfa Laval's unit] could no [sic] achieve 24% TS cake at 28 lbs/ton TS so they are going to rewrite this part of the spec." Defendants' Exh. A-12 (doc no 126-13).

In a January 25, 2001 letter to Plaintiff, B & V informed Plaintiff that the current draft of the procurement documents would require, *inter alia*, minimum dewatered cake solids of 24% dry solids and a maximum polymer dosage of 32 pounds per dry ton. Defendants' Exh. A-4, Affidavit of Mark Fetter (doc no 126-5) at Exhibit 5. B & V noted that pilot test results indicated that Alfa Laval could meet these performance criteria. *Id.* However, based on the pilot test data, it appeared that "Andritz will have difficulty meeting the current performance requirements established for this project." *Id.* Specifically, the tests showed that to achieve 24% cake solids concentration, the Andritz units required polymer doses of 35-37 pounds. *Id.* In light of this result, B & V identified three alternatives: to continue the bidding schedule with both Andritz and Alfa Laval, sole source the project to Alfa Laval, or return to the pre-qualification stage to find additional bidders. *Id.* Plaintiff elected to continue the process with Andritz and Alfa Laval.

On February 19, 2001, B & V sent Alfa Laval a letter inviting Alfa Laval to submit a procurement bid. The letter contained the following information:

> Based on our analysis, it appears that [Alfa Laval's equipment] will be able to meet a cake solids concentration of 24 to 26 percent . . . . We have also concluded from your pilot testing that a minimum[2] [sic] polymer dose of 28 pounds of active polymer per dry ton of biosolids will be required to meet the minimum cake solids concentration of 24 percent. While Alfa Laval has the responsibility to evaluate your pilot testing data and determine the appropriate performance parameters for the bid form, our project team has established the limits shown above that will be acceptable for the bid evaluation. If Alfa Laval submits any performance parameters in your bid form that are more favorable than listed above, our project team will consider those values to be unjustified based on your pilot testing program and [Plaintiff] reserves the right to reject your bid as non-responsive, should this occur.

Defendants' Exh. A-4, Affidavit of Mark Fetter (doc no 126-5) at Exhibit 3. A substantially similar letter with the same date was sent to Andritz, but the letter provided that Andritz would be permitted to submit a bid containing a "minimum" polymer dose of 34 pounds of active polymer per dry ton of biosolids.[3] Defendants' Exh. A-4, Affidavit of Mark Fetter (doc no 126-5) at Exhibit 7. The record does not reveal how the decision was made to limit Alfa Laval's polymer dose to 28 pounds, instead of the 32 pounds previously suggested in B &

---

[2]All parties appear to have understood that the letter actually set forth the maximum polymer dose for a qualifying bid and that if Alfa Laval's bid exceeded 28 pounds polymer, it could have been disqualified.

[3]Defendants contend that Andritz complained that sludge conditions had "changed" in December 2000 and that this was the reason for the lowered performance requirements, but their evidence does not support this. The evidence submitted shows only that there were daily or monthly variations in the sludge and that there were generally some characteristics that made dewatering at the Plant difficult. There is nothing to indicate that sludge characteristics were markedly different for Alfa Laval's pilot testing than for Andritz's pilot testing.

V's January 25, 2001 letter. Alfa Laval was not informed of the higher polymer limits in the bid invitation to Andritz.

Alfa Laval submitted a bid for equipment on or around March 14, 2001 for $ 3,684,884 for the four units. It projected a required polymer dose of 28 pounds per dry ton biosolids and 26% cake solids concentration. Defendants' Exh. A-24 (doc no 126-26) at IB-6. B & V reviewed the bids and provided comments to Plaintiff in a memo dated March 22, 2001. Defendants' Exh. A-30 (doc no 126-32). It noted that Andritz had submitted a protest concerning the interpretation of the pilot test results. *Id.* B & V again stated its determination that Alfa Laval could produce a cake solids concentration of 24% using a polymer dose of 28 pounds per dry ton. *Id.* It also concluded that Alfa Laval had submitted the lowest bid. *Id.*

In an internal memorandum dated March 20, 2001, the responsible representatives of Plaintiff recommended to its Board of Directors that the contract be awarded to Alfa Laval. Defendants' Exh. A-2 (doc no 126-3). It noted that although the basic equipment costs of Andritz was lower, Andritz's operation costs would be higher over the life cycle of the units. *Id.* Nonetheless, around March 28, 2001, representatives of Plaintiff calculated possible performance penalties assuming that the average performance test polymer requirements was 30 pounds per ton of dry solids, rather than a submitted 28 pounds per ton, as well as penalties if the cake dry solids requirements were not met. Defendants' Exh. A-4, Affidavit of Mark Fetter (doc no 126-5) at Exhibit 8.

The specifications for the bid contract set forth certain milestones and a payment schedule. Contract, Defendants' Exh. A-19 (doc no 126-20) at PA-3. The contract required a performance bond, which Alfa Laval obtained from National Union. Pursuant to the

contract, a third party construction contractor would install the centrifuge units. Contract at 01015-1. The contract required Alfa Laval to perform "field sampling" as part of its quality control, and gave Alfa Laval the right to determine "the exact time and location of field sampling." *Id.* at 01400-1.

The contract set forth the "Service Conditions" of operation and described the process as follows: "Digested sludge (biosolids) overflows to holding tanks for storage prior to dewatering. Biosolids will be conditioned with polymer and will contain ferric chloride to minimize struvite formation." *Id.* at 11344-3. The characteristics of the biosolids to be dewatered were specified by influent biosolids concentration by weight, temperature, pH units, maximum percent WAS/total biosolids by weight, and concentration of volatile suspended biosolids. *Id.* The contract contained performance and design requirements, including general mechanical requirements, performance requirements (including 24% dewatered cake solids concentration and maximum polymer dosage as determined by the 2000 pilot test results, presumably at 28 pounds for Alfa Laval), structural requirements, water supply requirements, and noise levels. *Id.* at 11344-4 to 11344-6.

Section 13 of the specifications contained testing requirements during installation and thereafter. *Id.* at 11344-19. As noted above, the final milestone in the contract was "performance testing," completion of which would entitle Alfa Laval to the full contract payment. The contract required "Field Performance Tests" on each unit after proper installation and normal operation. *Id.* at 11344-20. The testing was to be completed from November 1, 2003 to February 28, 2004. *Id.* Field tests were to be tested for the maximum performance conditions. *Id.* at 11344-21. "Consistent compliance with design conditions shall be defined as the average of sample values meeting or exceeding

performance parameters listed by the Manufacturer in the Bid Form." *Id.*

The contract specified the consequences for failing to meet the bid's performance requirements. Of particular import for the issues of this case, the contract differentiated between performance requirements of the equipment for feed rates, solids loading and recover, on the one hand, and, on the other hand, the required percentage components of the product of the equipment:

> Should the equipment not achieve consistent compliance with the performance requirements listed by the Manufacturer in the Bid Form during the extended tests, then the Manufacturer shall modify the equipment and repeat the field evaluation tests. . . . Should the equipment fail to process influent biosolids at the specified volumetric feed rate, solids loading rate, and solids recovery, the equipment shall be rejected and shall be replaced by the Manufacturer at the Manufacturer's expense with acceptable equipment at no additional cost to the Owner. . . . Should the equipment meet the performance requirements listed by the Manufacturer in the Bid Form for feed rate, solids loading, and solids recovery during the performance tests but fail to meet the Bid Form polymer, power requirements, or dewatered sludge cake dry solids, the following liquidated damages will be paid by the Centrifuge Manufacturer to the Owner: [setting forth formulae for calculations of damages].

*Id.* at 11344-23.

It appears that the contract milestones were achieved without incident until the final performance testing. The parties agree that the warranty period on each centrifuge began to run on or around August 27, 2003. The performance tests were initially performed in July 2004.[4] It is undisputed that the equipment met the contract requirements for feed rate, solids loading, solids recovery, power requirements, and noise requirements. However,

---

[4]The parties apparently agreed to an extension of time for the field testing.

7

Plaintiff asserted that the product of the equipment did not meet the performance levels of 24 or 26% cake solids at 28 pounds per dry ton polymer.[5] Alfa Laval contended that the reason for this was that the Plant was not operating in the same mode as it had during the pilot tests and that problems at the Plant with foaming and other issues contributed to the performance deficiencies.

A number of events and changes occurred at the Plant after Alfa Laval's pilot testing. It is undisputed that on December 22, 2000, Plaintiff suffered catastrophic failure in its Digester No. 4 due to excessive foaming. Because of the foaming issues and other matters, Plaintiff discontinued its previous cleaning schedule of the digesters and instituted changes in its sludge pumping strategy. Foaming continued to be an issue through 2004, which Plaintiff's own engineers considered to have an impact on the digestion and dewatering processes. Because of concerns about taking the digesters offline, typical preventative maintenance was not done in 2004. Alfa Laval performed its pilot testing on sludge from Plaintiff's Digester No. 3, which, at the time, used a gas cannon mixer, but the gas cannon mixers were not used in 2004, including during the performance tests.

Alfa Laval made efforts to bring the centrifuges up to the specifications for cake dry solids and polymer usage, including testing and offering to install newer model centrifuges around July to September 2005. Plaintiff rejected the replacement centrifuge units for reasons that are not apparent from the record. When asked in their depositions, Plaintiff's representatives did not identify any other manufacturer's equipment that would be capable

---

[5]The contract documents set the percentage at 24%, but the initial testing resulted in 26%. Plaintiff's complaint alleges the contractual standard is 26%. Amended Complaint at ¶ 14.

of producing the level of cake dry solids concentration at the polymer levels specified in the contract. In addition, they were unable to identify any further modifications or engineering efforts by Alfa Laval that could remedy the performance issues. Plaintiff has continued to operate Alfa Laval's centrifuges and apparently has no other complaints about their performance.

On or around October 27, 2005, Plaintiff notified National Union and Alfa Laval that Plaintiff was considering declaring a "Manufacturer Default" by Alfa Laval and requested a conference with Alfa Laval and National Union to discuss how to remedy the problems. On or about January 25, 2006, Plaintiff declared a Manufacturer Default and formally terminated Alfa Laval's right to complete the contract. Plaintiff then sent National Union an additional written notice, on or around February 2, 2006, demanding that National Union perform its obligations under the bond. Plaintiff has not identified any failure of the centrifuges to conform to the contract or breach of the contract terms other than the cake dry solids and polymer deficiencies. It is undisputed that Plaintiff at no time demanded that Alfa Laval or its surety pay the performance penalties set forth in the contract.

Plaintiff filed this action asserting damages claims against Alfa Laval for breach of contract and against National Union for breach of the performance bond. Alfa Laval filed a counterclaim against Plaintiff, asserting the following claims for relief: (1) a declaration that Plaintiff's declaration of default and attempt to terminate the contract was wrongful and other matters; (2) breach of contract; (3) changed conditions; (4) breach of good faith and fair dealing; (5) promissory estoppel; (6) superior knowledge; and (7) unilateral mistake.

<u>Standard of Review</u>

Summary judgment is appropriate when there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

If the moving party bears the ultimate burden of persuasion at trial, it must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

## Discussion

Defendants move for summary judgment on two of Alfa Laval's counterclaims (Claims I and VI) and on their affirmative defense of impossibility.

1. <u>Wrongful Termination</u>

Alfa Laval's first counterclaim seeks a declaration that Plaintiff's attempt to terminate was wrongful and a breach of the contract. Alfa Laval alleges that it substantially performed its obligations under the contract and that Plaintiff accepted the centrifuges and has had beneficial use and enjoyment of the centrifuges for several years. In addition, Alfa Laval contends that Plaintiff materially breached the contract in various ways before attempting to terminate the contract. It seeks a declaration that Plaintiff's termination was

10

wrongful and constitutes a material breach, excusing Alfa Laval from further performance or liability under the contract. In the motion for summary judgment, Defendants specifically argue that the contract provides exclusive remedies for the failure to achieve the cake solids concentrations and polymer usage performance requirements and therefore does not permit termination and rejection of the centrifuges on that basis. In addition, Defendants argue that Plaintiff had accepted the centrifuges and, under the Uniform Commercial Code ("UCC"), could not thereafter withdraw its acceptance.

These arguments are predicated upon Defendants' interpretation of the contract which Plaintiff disputes. Interpretation of a contract is a question of law. *Ad Two, Inc. v. City and County of Denver, ex rel Manager of Aviation,* 9 P.3d 373, 376 (Colo. 2000). "A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed. The touchstone in determining the intention of the parties is the language of the written agreement. If the language is plain, clear and unambiguous, a contract must be enforced as written." *Randall & Blake, Inc. v. Metro Wastewater Reclamation Dist.*, 77 P.3d 804, 806 (Colo. App. 2003) (citations and internal punctuation omitted). Whether a contract is ambiguous is also a question of law for the court. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo. 1984). A contract is ambiguous when it is susceptible to more than one reasonable interpretation. *National Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P. 2d 741, 746 (Colo. 1992). If I conclude that a contract is ambiguous then its meaning is a question of fact to be determined by the jury or court. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 919 (Colo. 1996).

The parties do not argue that the contract terms are ambiguous and I agree as those

11

terms regarding the performance and product of the equipment have only one meaning. The contract clearly provides when the centrifuges may be rejected–specifically, if "the equipment fail[s] to process influent biosolids at the specified volumetric feed rate, solids loading rate, and solids recovery, the equipment shall be rejected and shall be replaced by the Manufacturer at the Manufacturer's expense." Contract at 11344-23. Plaintiff does not dispute that Defendant's centrifuges satisfy these criteria. Likewise, Plaintiff concedes that the centrifuges performed well in all other regards and that its engineers were satisfied with the mechanics and quality of the equipment. Accordingly, I conclude that Alfel Level performed that particular part of this contract.

However, the language of the contract quoted above plainly distinguishes between Alfa Laval's performance of the centrifuges and its obligations with regard to the characteristics of the dewatered solids which are the product of that equipment. As to that product, the distinctive language of the contract prescribes liquidated damages in the event the cake solids concentration and polymer usage were not met.

I conclude that the plain meaning of the contract was to bifurcate the remedies depending upon the performance issue. If Defendant failed to install acceptable centrifuges, Plaintiff could reject the installed equipment and require replacement at Defendant's expense. No such right was given with regard to the failure to meet the performance standards regarding the cake solids. This is an interpretation consistent with the clear language of the contract and results in a harmonious, sensible result. *See Shaw v. Sargent Sch. Dist.,* 21 P. 3d 446, 449 (Colo. App. 2001).

I note that the parties do not address the possible issue of whether the liquidated damage provision is an unenforceable penalty. Generally a liquidated damage provision

12

is valid if (1) anticipated damages in case of breach are difficult to ascertain; (2) the parties mutually agreed to the damage amount; and (3) the amount, when viewed at the time of the contract, was a reasonable estimate of potential actual damages. *Board of County. Comm'rs of Adams County v. City and County of Denver*, 40 P.3d 25, 29 (Colo. App. 2001). As this issue is not before me at this time, I offer no opinion about the enforceability of the liquidated damages formulae.

Plaintiff, therefore, may have been entitled to demand liquidated damages when Alfa Laval's efforts to improve the centrifuges failed, but Plaintiff could not terminate the contract, as the parties clearly intended for the contract to be completed notwithstanding the failure of the centrifuges to yield a product of certain standards. Plaintiff's attempt to terminate the contract was therefore without contractual basis.

Plaintiff argues that it was entitled to declare a breach of the contract because Alfa Laval did not pay the liquidated damages, despite the fact that Plaintiff never made a demand. This argument is unavailing. "When obligations of a contract are mutual and concurrent, neither party is discharged from complete performance until each has tendered performance as obligated under the contract and demanded performance of the other." *Harris v. Hanson*, 821 P.2d 821, 822 (Colo.App. 1991). Plaintiff withheld its final payments and never demanded the liquidated damages. Only Plaintiff was in the position to inform Alfa Laval that it was not satisfied with the modifications or replacement centrifuges and desired to exercise its right to those damages. Other options were also available, including attempting further modifications or waiving the contractual damages, and Alfa Laval could not know that its performance was expected unless notified by Plaintiff. Accordingly, Alfa Laval's failure to pay the liquidated damages, without a demand from Plaintiff and without

Plaintiff's tender of its own payment obligations, was not a breach of the agreement.

Plaintiff's remaining arguments go to the failure of the performance by the centrifuges and provide no explanation for why the express remedies and limitations in the contract should not be enforced according to their plain meaning.[6] I agree that summary judgment should enter in Defendants' favor declaring the termination in violation of the contract. I otherwise reserve ruling on remedies, including any damages for either party.

 2. Superior Knowledge

Defendants also seek summary judgment in their favor on Alfa Laval's sixth counterclaim, failure to disclose superior knowledge. The superior knowledge doctrine, most commonly applied in construction and United States government contract cases, is based on the premise that "[a] contracting party that has superior knowledge about conditions that may impact the other party's use of a product or performance of a contract will have a 'duty to inform' that overrides any duty to inquire on the part of a contractor." *Guarantee State Bank v. Farm Serv. Agency of the United States Dep't of Agric.*, 68 Fed. Appx. 134, 2003 WL 21279544 (10th Cir., June 4, 2003) (quoting 1 BRUNER & O'CONNOR CONSTRUCTION LAW § 3:25 (May 2002)). To establish a duty to disclose based on superior knowledge, the following prerequisites are required: (1) the government possesses

---

[6]The cake solids concentrations and polymer usage issues appear to be the only grounds for Plaintiff's declaration of default. All of the contemporaneous evidence demonstrates that the only problem Plaintiff considered to be material was the failure of these two performance requirements. Plaintiff's interrogatory responses assert that the reasons for the contract termination were privileged and were otherwise vague about the grounds for Plaintiff's declaration of default. Plaintiff's representatives in their depositions also did not identify any other performance issues or deviations from the contract. Therefore, despite Plaintiff's denials, I consider it undisputed that these two performance issues are the only alleged failures by Alfa Laval giving rise to Plaintiff's attempt to terminate the contract.

knowledge of vital facts regarding a solicitation or contract, (2) the contractor neither knows nor should have known of the facts, by contract specification or otherwise, (3) the government knew or should have known of the contractor's ignorance of the facts, and (4) the government failed to disclose the facts to the contractor. *Miller Elevator Co., Inc. v. United States,* 30 Fed. Cl. 662, 675 (Ct. Cl. 1994) (citations omitted).

Defendants argue that Plaintiff possessed vital information affecting the solicitation and formation of the contract, specifically that neither Alfa Laval nor Andritz was able to meet the minimum performance criteria in the RFQ and that Andritz was permitted to submit a bid with a higher polymer limit than Alfa Laval. Assuming without deciding that the superior knowledge doctrine applies here, as both parties appear to concede, I conclude that there are issues of fact that preclude summary judgment on this claim.

As an initial matter, I disagree with Defendants that Plaintiff had a duty to disclose the fact that Andritz was permitted to bid with different requirements. The RFQ and contract put Alfa Laval on notice that performance requirements in the bid were to be based on the pilot testing results. Differences in performance with respect to solids concentrations and polymer dosage would simply be factored into overall costs in Plaintiff's evaluation of the different bids. I agree with Plaintiff that only Alfa Laval's test result is relevant to the issue of whether Alfa Laval's units could perform as required by the contract. Therefore, any withholding of information about Andritz's performance on the pilot tests or variance in performance requirements is immaterial.[7]

---

[7]I do not consider Defendants' argument that Plaintiff was required to disclose that the sludge had "changed" after Alfa Laval's pilot test. Again, Defendants have not presented undisputed evidence showing that there was any change in the sludge conditions after Alfa Laval completed its pilot testing but before Andritz performed its

15

In contrast, there is evidence suggesting that Plaintiff was aware that Alfa Laval's pilot test data indicated that Alfa Laval's units might not be able to meet the performance requirements set forth in the cover letter to the invitation to bid. Memoranda and correspondence from B & V indicate that there was discussion of relaxing the performance requirements because not even Alfa Laval's units could achieve the levels initially set forth in the RFQ. This would certainly be material to Alfa Laval's bid.

Nonetheless, I conclude that summary judgment is not appropriate on this claim. I cannot discern from the record whether both parties had the same information about Alfa Laval's pilot test data and were both capable of drawing the same conclusions. This is relevant to the second and third elements of the superior knowledge doctrine–the contractor's ignorance of the material information. Plaintiff's cover letter for the invitation to bid contained the following disclaimer: "While Alfa Laval has the responsibility to evaluate your pilot testing data and determine the appropriate performance parameters for the bid form, our project team has established the limits shown above that will be acceptable for the bid evaluation." Thus, it appears on the one hand that Alfa Laval did have access the relevant information. On the other hand, if Plaintiff's team in fact had doubts about whether Alfa Laval could achieve the limits set forth in the letter, this could be information that Alfa Laval needed to know in making its own analysis, as Plaintiff had significantly more knowledge about its own facilities and sludge conditions than Alfa Laval. Similarly, there is no information about why, after initial discussion of relaxing the polymer dosage, this

---

tests. Nonetheless, in the event Alfa Laval could prove at trial that such a change occurred and that it affected the performance of the centrifuges, it could qualify as vital information that Plaintiff would have had a duty to disclose.

16

requirement was not changed in the invitation to bid for Alfa Laval. Since there is a genuine issue of fact as to whether Alfa Laval knew or should have known that its own pilot testing data showed its units might not be able to achieve the performance requirements with respect to the cake dry solids concentration and polymer dosage, summary judgment on the superior knowledge claim should be denied.

      3.      <u>Impossibility</u>

Finally, Defendants seek summary judgment on Alfa Laval's affirmative defense of impossibility. "The essence of the defense is not impossibility, but rather impracticability which is determined by whether 'an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.'" *Town of Fraser v. Davis*, 644 P.2d 100, 101 (Colo. App. 1982) (citing *Littleton v. Employers Fire Insurance Co.*, 169 Colo. 104, 453 P.2d 810 (1969)). Impossibility is established by the following:

> Where, at the time a contract is made, a party's principal purpose is substantially frustrated without his fault by a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty of that party to render performance arises, unless the language or circumstances indicate the contrary.

*Id.* (quoting Restatement (Second) of Contracts § 266, sub 2 (1981)).

Defendants argue that Alfa Laval's performance was rendered impossible or impracticable because conditions changed after the pilot testing, specifically with respect to Plaintiff's problems with foaming, changes in digester cleaning and use, and operational changes. In addition, Defendants contend that Plaintiff's admission that it is not aware of any other company, machine, or process that could achieve the performance required by

17

the contract demonstrates that it is impossible to achieve the contract specifications. Again, however, I conclude there are issues of fact precluding summary judgment on these issues.

There is no dispute that many changes occurred at the Plant after Alfa Laval's pilot test. However, it is highly disputed that these changes caused the performance deficiencies complained of here. The parties appear to agree that the sludge used in 2004 matched the specifications in the contract; however, Alfa Laval argues that other sludge characteristics, not captured by the specifications, affected the performance test results. Plaintiff presents an expert report disputing these contentions. Plaintiff's Exh. 11 (doc no 153-12). Moreover, as noted by Plaintiff, there are issues of fact as to whether some of these changes could have been foreseen or anticipated by Alfa Laval. Alfa Laval also complains that Plaintiff did not permit Alfa Laval to conduct its performance tests under precisely the same conditions as the pilot test (i.e., using sludge from Digester No. 3, using the gas cannon mixer, taking sludge directly from the digester rather than from a holding tank). Again, I conclude that there are issues of fact as to whether it was reasonable for Alfa Laval to expect performance testing to be under the identical conditions as pilot testing. The contract is somewhat ambiguous in this regard as it specifies that Alfa Laval can control its quality control testing by deciding when and where to take samples, but it is unclear whether this applies to the final performance testing. Because causation and foreseeability are disputed, summary judgment is not appropriate on this defense.

Finally, I reject Defendants' argument that their impossibility defense is established by their contention that no one can meet the performance requirements, essentially a "state of the art" defense. As noted in another case from this district, by expressly warranting that

18

its units could meet the performance requirements, Alfa Laval assumed the risk of impossibility in this regard[8]. *Colorado-Ute Elec. Assoc., Inc. v. Envirotech Corp.*, 524 F. Supp. 1152, 1158 (D. Colo. 1981) (Carrigan, J.) (citations omitted). Therefore, I will deny summary judgment on the impossibility defense.

Accordingly, it is ordered:

1. Defendants' Consolidated Motion for Summary Judgment (doc no 125) is granted in part and denied in part.

2. Summary judgment shall enter on Alfa Laval's first counterclaim to declare that Plaintiff's remedy for any failure of Alfa Laval's centrifuge units to meet cake dry solids concentrations and polymer dosage performance requirements is limited to damages, either the liquidated damages pursuant to the contract (or, if the liquidated damages provision is unenforceable, then to actual damages), not rejection and termination. Accordingly, Plaintiff had no right to declare default or terminate the contract because of Alfa Laval's failure to meet the polymer and dry solids standards.

---

[8]Nonetheless, this does not preclude the impossibility defense to the extent that the failure to perform was caused by unforeseen changes in sludge conditions and operations at the Plant.

3. Summary judgment is denied on Alfa Laval's sixth counterclaim and its affirmative defense of impossibility.

DATED at Denver, Colorado, on April 29, 2008.

BY THE COURT:


s/ Walker D. Miller
United States District Judge